## HOWSER v. PEARSON.
### Civ. A. No. 1245–49.

United States District Court
District of Columbia.

March 1, 1951.

Herbert M. Bingham, and Roger Robb, both of Washington, D. C., for plaintiff, for the motion.

William P. Rogers, of Washington, D. C., for defendant, opposed.

HOLTZOFF, District Judge.

This is an action for defamation by means of a radio broadcast. After a trial on the merits, judgment was rendered for the defendant on the basis of a special verdict of the jury. The plaintiff now moves for a new trial. As two of the three grounds urged in support of the motion involve questions as to the admissibility of evidence, it is necessary to outline the issues and certain proceedings at the trial in order to determine the validity of these two grounds in their proper setting.

■ The plaintiff is a former Attorney General of the State of California. The defendant is a radio commentator. The latter broadcast a statement over the radio, originating in the District of Columbia, which was carried by radio stations in California and nine other western States. The statement charged the plaintiff with having committed a crime, to wit, accepting a bribe and, therefore, was defamatory *per se*. It was unnecessary to determine whether the circulation of defamatory material by radio is libel or slander, as the contents of the publication were such that it was both libelous *per se* and slanderous *per se*.[1]

■ The defendant pleaded, first, truth; and second, qualified privilege. For the latter defense the defendant relied on the law of California to the effect that a defamatory statement concerning a public

1. See Hartmann v. Winchell, 296 N.Y. 296, 73 N.E.2d 30, 171 A.L.R. 759; Sorensen v. Wood, 123 Neb. 348, 243 N.W. 82, 82 A.L.R. 1098; Miles v. Louis Wasmer, Inc., 172 Wash. 466, 20 P.2d 847; Penal Code of California, Chap. XI, sec. 258.

official or a candidate for public office, is privileged even if the statement is untrue, provided it was uttered in good faith and without malice. Snively v. Record Pub. Co., 185 Cal. 565, 571, 578, 198 P. 1. The same rule prevails in Arizona and Utah, which are two of the other States in which the broadcast was also circulated, Connor v. Timothy, 43 Ariz. 517, 523, 33 P.2d 293; Williams v. Standard-Examiner Pub. Co., 83 Utah 31, 27 P.2d 1. It will be observed that qualified privilege under the law of California is far broader than that generally prevailing at common law, for ordinarily privilege in respect to attacks on public officials and candidates for public office is limited to fair comment and criticism and does not extend to untrue statements of fact, Washington Times Co. v. Bonner, 66 App.D.C. 280, 286, 86 F.2d 836, 110 A.L.R. 393.

At the beginning of the trial it was, therefore, necessary to solve the problem of conflict of laws, and determine what law regulated the substantive rights of the parties. The defendant contended that the law of California should apply in view of the fact that the plaintiff was a resident of California; that by far the greater part of the dissemination of the defamatory statement took place in California; and that the injury to the plaintiff, if any, occurred principally in that State. The plaintiff, on the other hand, urged that the law of each State to which the defamatory matter had been transmitted should govern as to so much of its distribution as took place within its borders.

▆▆▆▆ It is a general principle of the law of torts that the substantive law regulating the rights and liabilities of the parties, is the law of the place where the wrong was committed. Libel and slander take place where the defamatory statement is communicated and not in the place from which the offending material is sent or where it originates. Restatement on Conflict of Laws, Section 377, Note, paragraph 5. The question was complicated, however, by the fact that the broadcast was heard in a number of States. The Court was, therefore, called upon to determine whether the law of California alone was applica-

ble, or whether the law of each of the States where the broadcast was received governed the rights of the parties to the extent to which the material was distributed in that jurisdiction. There appear to be only three cases in the Federal appellate courts in which this topic has been discussed. In only one of them was it actually decided.

In Caldwell v. Crowell-Collier Publishing Co., 5 Cir., 161 F.2d 333, 335, the plaintiff was the Governor of Florida. The alleged libel was published not only in Florida, but in numerous other States. The court stated that the injury to the plaintiff must have occurred mainly in Florida, where he resided and held office, and that the law of Florida was principally to be regarded. It is to be noted that the court did not state that the law of Florida was to govern exclusively. The court added the following comment: "We observe, however, no substantial difference between the law of Florida and that of other common law States." Obviously, therefore, the point here presented was not actually decided in that case, and its discussion must be regarded as a dictum.

Another case on this point is Mattox v. News Syndicate Co., 2 Cir., 176 F.2d 897, 12 A.L.R.2d 988. There the publication took place in New York and Virginia. The plaintiff was a resident of Virginia. He was a private individual not known to the public and having no acquaintances or friends in New York. The trial court ruled that the law of Virginia was applicable. The Court of Appeals affirmed the judgment, holding that the plaintiff was not damaged in New York, since no one knew him there. Although there are some incidental remarks on the point, the Court does not definitely indicate what would have been the decision if the plaintiff had been a person of public standing, who was known in both New York and Virginia.

The one case that actually passed upon the problem presented to this Court is Hartmann v. Time, Inc., 3 Cir., 166 F.2d 127, 1 A. L.R.2d 370. The court there held regarding a defamatory statement in a magazine that had a nationwide distribution that the law of each State in which the material had

been circulated applied to the publication in that State.

It seemed obvious that if in the case at bar the statement had been transmitted to only a single State, for example, Nevada, where the common law rule as to qualified privilege prevails, the law of that State would have governed. It appeared illogical and unreasonable to hold that because the material was disseminated in two or more States, say in Nevada and California, the Nevada rule should no longer apply to so much of the circulation as took place in that State and that the law of California, which is more favorable to the defendant, should regulate the rights and liabilities of the parties throughout.

It was argued in behalf of the defendant that the law of the plaintiff's domicile should apply under the circumstances of this case. There is some support for this contention in a number of articles in legal periodicals, although hardly in judicial decisions. It seemed fallacious to evolve a doctrine that the law of the place where the defamatory statement was published should govern only if the circulation took place solely in a single State, but that the law of the plaintiff's domicile should rule if the publication occurred in two or more States. No logical distinction in principle was discernible between a publication in one State and a publication in several States in this respect.

The court reached the conclusion, therefore, that the substantive law of each of the States in which the defamatory matter was circulated should govern the rights and liabilities of the parties in respect to so much of the circulation of the offending material as took place in that State. The corollary followed that the defendant was not entitled to the benefits of the broad California rule as to privilege, except as to the dissemination that took place in that State and the other States in which the same doctrine prevailed.

It was argued by defense counsel that this conclusion would create a practical difficulty in submitting the issues to the jury and would unduly complicate the questions to be determined. Defense counsel relied on some pointed passing observations made by Judge Learned Hand in Mattox v. News Syndicate Co., supra, 176 F.2d at page 900, to the effect that "It would certainly be an unworkable procedure to tell a jury that they should award damages, so far as they were suffered in State X, according to one measure, and, so far as they were suffered in State Y, according to another. * * *" Manifestly, there is a great deal of force in this objection. Yet it would be unfortunate if practical obstacles were to stand in the way of applying a correct rule of law. Trial judges are under a duty to develop devices that would minimize such difficulties. In any event this hurdle did not appear insurmountable in this instance. Although the defamatory statement was heard in ten States, actually there were only two rules of law as to privilege to be applied, each of the ten States falling in one or the other of these two categories.

In order to clarify and segregate the issues for the jury and to simplify and lighten its burden, the court called for a special verdict and propounded separate questions as to whether truth of the publication was established, and as to whether the defense of qualified privilege as defined by the law of California, was sustained. The court also submitted separate inquiries to the jury as to the amount of damages suffered in States in which the California rule as to privilege did not prevail and the damages sustained throughout. In addition to these issues, the defendant also raised the point that as a matter of fact the plaintiff suffered no damages anywhere because his reputation was allegedly bad.

The questions submitted to the jury, and the jury's answers, were as follows:—

Question No. 1. Has the defendant established that the statement made by him concerning the plaintiff was true?

Answer: Yes.

Question No. 2. Has the defendant established that the statement was made by him without actual malice?

Answer: Yes.

Question No. 3. Has the plaintiff suffered any damages as the result of the broadcasting of the statement and, if so, in what amount?

940

Answer: None. .

Question No. 4. (a) Has the plaintiff established that the defendant acted with such malice or such wanton, reckless and willful disregard of the plaintiff's rights as should entitle the plaintiff to receive punitive damages in addition to the damages stated in answer to Question No. 3?

Answer: No.

(b) If your answer to (a) is "yes", state the amount of the punitive damages plaintiff should receive.

Answer: None.

Question No. 5. Has the plaintiff suffered any damages as a result of the broadcasting of the statement in the States of Oregon, Washington, Nevada, Idaho, Colorado, Texas, and New Mexico only, and excluding California, Arizona, and Utah; and if so in what amount?

Answer: None.

■ It will be observed from the foregoing questions and answers that the jury reached the conclusion that the truth of the offending publication had been established. This finding was a complete defense to the action and alone necessitated judgment for the defendant. The other defense, that of qualified privilege, was merely partial, since it was applicable only in California and two of the other States involved. Moreover, once truth was shown, privilege became insignificant. So too, the amount of damages became academic. In the light of the disposition made of the issues by the jury, questions of admissibility of evidence bearing on any matter other than the issue of truth were rendered moot. The motion for a new trial must be considered in the light of this background.

Before proceeding to discuss the motion in detail, it seems useful to recall and bear in mind the following sage observations of the Court of Appeals for this circuit concerning motions for a new trial in jury cases, made in Freid v. McGrath, 76 U.S. App.D.C. 388, 393, 133 F.2d 350, 355: "When issues have been tried by a jury, its determination should not, casually, be set aside. Hence, appellate courts may commendably exercise restraint in reversing orders *denying* new trials. *And trial courts should practice similar judicial restraint.*[2] It is important that there shall be an end of litigation. As has been well said: 'It is neither correct nor useful to attach "the monstrous penalty of a new trial" to supposed technical errors if any, which are not prejudicial.'"

The first of the two questions relating to admissibility of evidence concerns the exclusion of the deposition of one Ted C. Sten, which the plaintiff offered to read in evidence. The defamatory publication involved in this case charged that a bribe, consisting of twelve one hundred dollar bills, was sent to the plaintiff in an envelope by a well-known gambler, the purpose of the payment being to secure protection from criminal prosecution. The court ruled throughout the trial that in order to sustain the defense of truth, it was incumbent on the defendant to prove that this specific transaction took place and that it was neither sufficient nor relevant to indicate that there was a general alliance between the plaintiff and some of the gambling elements in California. The record shows that at one stage of the trial the court remarked that the case would not be permitted to spread over to the plaintiff's associations; that the defamatory statement was not that the plaintiff associated with gamblers, but that he accepted a bribe on a particular occasion, and, hence, the issue was a narrow one (Tr. p. 120).

In order to sustain the defense of truth, the defendant offered evidence tending to show that at a time when the plaintiff was a candidate for elective office, one Joseph A. Irvine, who admittedly was a bookmaker, turned over an envelope with its contents to one James T. Mulloy, who was then employed at the plaintiff's campaign headquarters, and instructed Mulloy to deliver the envelope intact to the plaintiff personally; that the contents of the envelope consisted of twelve one hundred dollar bills; and that Mulloy delivered the envelope and its contents to the plaintiff stating that they were being sent to him by Irvine. The plaintiff,

2. Emphasis supplied.

on the other hand, called Irvine as a witness, who denied the transaction *in toto*. On cross-examination Irvine, among other things, was interrogated concerning a prosecution on a gambling charge in which he had been the defendant. There were intimations in some of the questions that perhaps Irvine had been leniently dealt with in that case by reason of his alleged acquaintance with the plaintiff and the fact that he had retained the plaintiff's brother-in-law as counsel. Irvine emphatically denied these insinuations. His answers were entirely adverse to cross-examining counsel.

■ The plaintiff's counsel then tendered the deposition of one Ted C. Sten, who was deputy district attorney in charge of the branch office at Long Beach, California, in which the prosecution of Irvine had been handled. Counsel for the plaintiff explained that in the deposition Sten told of his connection with the Irvine case and just what had happened, in order to meet what counsel stated was "an implication in Mr. Rogers' cross-examination of Irvine that there was something fishy about this case." The court excluded the deposition as not relevant to any of the issues. On further consideration and reflection the court is of the opinion that its ruling was correct.

The line of cross-examination of Irvine to which reference has been made was permitted by the court solely to test the credibility of the witness. The events that transpired at Irvine's trial on the gambling charge were not in issue. Evidence of these occurrences would not have been admitted either on the issue of truth of the defamatory publication, or on any other question in the case. Consequently, counsel for the defendant was bound by the witness's answers to his inquiries, since they related wholly to a collateral matter. The defendant would not have been allowed to introduce evidence tending to contradict the replies given by the witness, Crawford v. United States, 30 App.D.C. 1, 24–26; Ewing v. United States, 77 U.S.App.D.C. 14, 21 et seq., 135 F.2d 633. *A fortiori* the plaintiff was not entitled to introduce evidence tending to corroborate the witness's answers as to a collateral matter. There is no basis either in principle or authority for such a course. Moreover insinuations contained in questions as to a collateral subject do not give rise to a right to contradict them. Only testimony may be refuted, and not questions asked by counsel.

■ It must not be overlooked that if the plaintiff were entitled to introduce evidence corroborating Irvine's answers on cross-examination as to a collateral matter, even though these answers were adverse to cross-examining counsel and favorable to the plaintiff, who had called him as a witness, the defendant would have been entitled to meet such testimony by contradictory evidence. The proceeding then would have degenerated into a trial of numerous side issues. Such a course would not have been in the best interests of the administration of justice, because it would have tended to obscure and confuse the real questions to be determined by the jury. There is a natural and frequent tendency for trials to move on tangents and away from the main issues. It is a function, even a duty, of the trial judge to control and check this tendency of his own motion. A trial should move like a stream within its recognized channels and not like one that overflows its banks and floods the adjoining property effacing boundary lines and obliterating the distinction between the river bed and the adjacent land. This principle is no mere technicality. It is important both from the standpoint of preventing confusion of issues and securing a determination of the questions actually involved, as well as for the purpose of precluding unnecessary consumption of time, which in a busy district with a heavy docket could be properly devoted to other cases.

■ The second question as to the admissibility of evidence raised on this motion is the exclusion of certain testimony offered by the plaintiff in rebuttal of certain statements made by the defendant while testifying in his own behalf. The defendant's testimony was devoted solely to the issue of privilege. He testified in detail in support of his contention that he made the defamatory statement without malice and in good faith, believing it to be true and having reasonable grounds to believe it to be true after making an adequate investi-

gation. In view of the fact, however, that the jury sustained the defense of truth, the issue of privilege vanished and became immaterial. Consequently, any question of admissibility of testimony in rebuttal of any part of the evidence given by the defendant on the witness stand is academic. While these comments would suffice as a ground for a disposition of the question now raised, nevertheless, it seems appropriate to discuss it on the merits, because on further consideration of the matter, the court adheres to its original ruling.

■ During his cross-examination the defendant was asked by counsel for the plaintiff whether he had attempted to secure the good offices of Mr. Smith of Los Angeles to intercede with the plaintiff to drop this suit. This line of cross-examination was permissible solely on the theory that an affirmative answer might have been construed as a lack of confidence on the part of the defendant in his own good faith, and would have been some evidence of a consciousness of a weakness in his contention that he had made an adequate investigation and uttered the statement without malice. The defendant replied, however, that it was Mr. Smith who had approached him and offered to act as an intermediary; that later Mr. Smith communicated with him again and stated that although the plaintiff wanted to drop the case, his attorneys had interposed an objection owing to the fact that they had been retained on a contingent fee basis. The answers apparently were not those that counsel had expected. Nevertheless, since the questions related to a collateral matter, the plaintiff was bound by the witness' responses. This is a peril encountered by one who embarks upon an unknown and uncharted sea of cross-examination. In rebuttal plaintiff's counsel called his client to the stand and asked him whether it was true that he wanted to drop the case. The court sustained an objection to the question on the ground that it related to a collateral matter and that consequently the plaintiff was bound by the witness's answer on cross-examination and was not at liberty to offer testimony to contradict it. This ruling is manifestly in accord with the principles

governing cross-examination. The previous discussion dealing with the admissibility of the deposition of Sten is equally applicable to the present question.

■ The remaining point raised by the motion relates to the selection of the jury. It is claimed by the plaintiff that one of the jurors gave a false answer on the examination on *voir dire* and that on this ground a new trial should be granted. Each of the prospective jurors was requested to state his occupation. The juror in question answered that he was "a sheet metal worker, self employed". In support of the motion for a new trial, an affidavit made by a lawyer associated with counsel for the plaintiff is adduced to the effect that the juror is listed in the District of Columbia Directory as a newsdealer at the Longfellow Building, and that on a specified Sunday the affiant observed the juror operating a news stand near the Longfellow Building. Assuming that there was no error in identification, the only inference of which this information is susceptible is that the juror in question in addition to being a sheet metal worker had a secondary occupation or employment on the side in which he was engaged on Sundays and possibly other off-days, namely, the operation of a news stand. It cannot be said, therefore, that the juror's answer was false. When a prospective juror is asked concerning his occupation, it is natural for him to name his principal activity. There are many persons who engage in a secondary occupation in their free time, but a complete answer would not require them to state both their principal and their side occupation.

A question could have been propounded whether any of the jurors have a secondary occupation, or a specific query could have been directed to the jurors, if counsel was particularly interested in ascertaining whether any juror devoted any part of his time to dealing in newspapers and periodicals. This was not done. It should be observed that the Court exercised the utmost liberality in propounding to the jurors questions submitted by counsel, and the queries just suggested would have been asked had counsel so requested. The Court feels that there is no foundation for the

contention that the juror gave a false answer or concealed any information which he should have revealed in answer to questions.[3] The cases on which the plaintiff relies are not in point, since each of them involved a situation in which the juror intentionally and purposely gave a false answer to a question directed to him on a vital matter.[4]

Counsel for the plaintiff now state categorically that they would have exercised one of their peremptory challenges against this juror had they known that he had any connection with the sale of newspapers. At the trial, however, they exhausted all of the challenges that the law allows. They do not indicate which of the challenged jurors they would have permitted to stay on the list in order to strike the juror here under discussion.

 The suggestion that the plaintiff may have been prejudiced by reason of the fact that a person who has some connection with the sale of newspapers was a member of the jury seems to border on the fanciful. It is suggested that since every news stand carries a Washington paper that prints the defendant's column, a news dealer would be prejudiced in the defendant's favor. By the same token, however, it might be urged that he would be prejudiced against the defendant because every news stand likewise carries newspapers that print material critical of the defendant. It is a matter of common knowledge, well-known to all readers of newspapers and periodicals, that nowadays it is customary for newspapers to carry contributions of columnists presenting opposing points of view and, therefore, the mere fact that a person reads a particular newspaper cannot give rise to an inference that he is prejudiced in favor of any one of the columnists who contribute to that newspaper. Moreover, there is no presumption and it is probably contrary to the fact that the operator of a news stand reads all of his own wares. The objections belatedly raised to the juror in question are not well founded.

The trial of this case consumed about a week. Assiduity of able counsel in studying the record has unearthed only two rulings on evidence which are now called in question. The court adheres to these rulings. No errors are assigned to the court's instructions to the jury. No errors are assigned in respect to anything else that occurred at the trial except the episode relating to the juror whose qualifications have been attacked. This point the court has also held to be untenable.

 In addition, the court desires to call attention to the principle that motions for a new trial are addressed to the discretion of the court. They should be granted only if to do so would promote the ends of justice. The parties to this case have had a fair trial. Each of them was given a full opportunity to present his contentions within the ambit of the rules of evidence. The verdict of the jury is not only sustained by substantial evidence, but is fully supported by the weight of the evidence. The court is of the opinion that substantial justice has been done.

Motion for a new trial is denied.

3. Orenberg v. Thacker, 79 U.S.App.D.C. 149, 143 F.2d 375.

4. Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; United States v. Lampkin, D.C., 66 F.Supp. 821.